## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Case No. 21-40994** |
| **Jeremy Guitton-Belon,** | ) | |
| | ) | **Chapter 7** |
| Debtor. | ) | |
| | ) | |
| | ) | |
| **Cale Moyer,** | ) | |
| | ) | |
| Plaintiff, | ) | **Adversary No. 22-4003** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Jeremy Guitton-Belon,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Cale Moyer brings this six-count[1] adversary proceeding under two sections of the bankruptcy code.  First, Cale argues that the court should except Cale's default judgment from defendant Jeremy Guitton-Belon's chapter 7 discharge under 11 U.S.C. § 523(a)(2)(A).  Second, Cale alternatively argues that the court should deny Jeremy's discharge entirely under 11 U.S.C. § 727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(4)(B).  Jeremy asserts a counterclaim under 11 U.S.C. § 523(d), arguing that he is entitled to reasonable attorney's fees and costs for defending Cale's § 523(a)(2)(A) action because Cale's position was not substantially justified.  For the following reasons, the court determines Jeremy did not: (1) obtain a debt by false pretense, false

---

[1]  Cale withdrew his second count under 11 U.S.C. § 523(a)(2)(C)(II).

representation, or actual fraud under § 523(a)(2)(A); (2) transfer, remove, destroy, mutilate, or conceal property of the debtor within one year with the intent to hinder, delay, or defraud a creditor under § 727(a)(2)(A); (3) fail to maintain and preserve adequate records under § 727(a)(3); (4) make a false oath or account under § 727(a)(4)(A); or (5) present or use a false claim under § 727(a)(4)(B). Consequently, Jeremy may receive a discharge of all debts in this case, including his debt to Cale. The court also determines that Jeremy did not satisfy his burden to establish his counterclaim under 11 U.S.C. § 523(d) because Jeremy's debt is not primarily a consumer debt.

## JURISDICTION[2]

The court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334 and 157(a). This case is statutorily core under 28 U.S.C. § 157(b)(2)(I) and (J) and is constitutionally core. The court, therefore, has authority to hear this case and make a final determination. No party has contested jurisdiction or the court's authority to make a final determination.

## BURDEN OF PROOF

As the plaintiff bringing this action under §§ 523 and 727, Cale bears the burden to prove each element of his complaint by a preponderance of the evidence.

---

[2] The findings and conclusions set forth in this opinion constitute the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such.

*Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Floret, LLC v. Sendecky (In re Sendecky)*,

283 B.R. 760, 763 (B.A.P. 8th Cir. 2002)).

## EVIDENTIARY ISSUES

The court conducted a trial in this adversary proceeding on May 3 and May 17,

2022.  At the trial Cale sought to admit exhibits 1–30 and Jeremy sought to admit

exhibits A–D, F, and G.  Cale and Jeremy stipulated to the admission of Cale's

exhibits 1–4 and 11–19, and Jeremy's exhibits A–D, F, and G.  Jeremy objected to

Cale's remaining exhibits.  The court sustained Jeremy's objections to exhibits 5, 8–

10, and 24–26.  The court reserved ruling on exhibits 6, 7, 20–23, and 27–30.  The

following table summarizes the exhibits for which the court reserved its ruling:

| Ex. No. | Description | Basis for Objection |
|---------|-------------|---------------------|
| 6 | Forwarded email from Arrow Renovation to Cale Moyer | Hearsay without an exception |
| 7 | Forwarded email from Arrow Renovation to Cale Moyer | Hearsay without an exception |
| 20 | Printout of G&S HomeAdvisor webpage | Not properly authenticated |
| 21 | Printout of Jeremy's Venmo account | Hearsay without an exception |
| 22 | Printout of 601 13th Street, Blue Springs, Mo. 64015 listing on Redfin.com | Hearsay without an exception |
| 23 | Printout of photographs from 601 13th Street, Blue Springs, Mo. 64015 listing on Redfin.com | Hearsay without an exception |
| 27 | City stamped engineering plans for 5206 Scarritt Avenue, Kansas City, Mo. 64123 | Not properly authenticated + Hearsay without an exception |
| 28 | Photographs from RA Engineering framing report | Not properly authenticated |
| 29 | Printout of Jeremy Guitton's LinkedIn webpage | Not properly authenticated |
| 30 | Photographs of 5206 Scarritt Avenue, Kansas City, Mo. 64123 taken by Cale Moyer | Not properly authenticated |

## A. Contested Exhibits

The court will first resolve the preliminary matter of Jeremy's pending objections to Cale's exhibits 6, 7, 20–23, and 27–30.  A court may admit a non-privileged document into evidence if: (1) the document is relevant; (2) the proponent authenticates the document, and (3) the document does not violate the rule against hearsay.  Fed. R. Evid. 402, 803, 901.

Jeremy did not object to Cale's exhibits on relevancy grounds, but Jeremy argues that Cale failed to properly authenticate exhibits 20 and 27–30, and that exhibits 6, 7, 21–23, and 27 constitute hearsay without an exception.  Cale does not meaningfully respond to Jeremy's objection to the authenticity of exhibits 20 and 28–30.  Cale appears to argue that exhibit 27 is self-authenticating.  Cale argues the court should overrule Jeremy's hearsay objections under two exceptions to the rule against hearsay.  He argues: (1) exhibits 6, 7, 20, 21, and 29 are admissible under the business records exception; and (2) exhibit 27 is admissible under the public records exception.  Cale, however, does not provide the basis for the court to admit exhibits 22, 23, 28, and 30.  For the following reasons, the court sustains Jeremy's objections to exhibits 20–23, and 27–29.  The court, however, overrules Jeremy's objection to exhibits 6, 7, and 30.

The court will first address whether Cale properly authenticated exhibits 20 and 27–30.  The court will then address whether Cale established that exhibits 6, 7, 20, 21, 27, and 29 fall within an exception to the rule against hearsay.

### 1. Authentication

Federal Rule of Evidence 901 contains a non-exhaustive list of ways a proponent may authenticate an exhibit. Relevant for the court's analysis are two examples from that list. A proponent may authenticate documentary evidence (a) by proving "a rational basis for that [proponent's] claim that the document is what it is asserted to be," *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1045 (8th Cir. 2010) (quoting *United States v. Wadena*, 152 F.3d 831, 854 (8th Cir. 1998)); Fed. R. Evid. 901(b)(1), or (b) by establishing the distinctive characteristics of the exhibit, such as the exhibit's appearance, contents, substance, or internal patterns. Fed. R. Evid. 901(b)(4).

Two of the exhibits at issue—28 and 30—are photographs. A proponent usually establishes that a photograph is what it claims to be under Rule 901(b)(1) by calling a witness—often, but not always, the photographer—to testify that the photograph is an accurate representation of the thing depicted as it appeared at the relevant time or to attest to when, where, and by whom the photograph was taken, and that the photograph is an accurate representation of the thing depicted as it appeared at the relevant time. *See MEGASUN, Inc. v. KBL Am., Inc.*, No. 10-1752, 2011 WL 1883240 *4–5 (E.D. Mo. May 17, 2011).

Exhibits 20 and 29 are printouts of two websites. A proponent may establish a printout of a website is what it claims to be under Rule 901(b)(1) by satisfying two requirements. *Nightlight Systems, Inc. v. Nitelites Franchise Systems, Inc.*, No. 04-2112, 2007 WL 4563875 *6 (N.D. Ga. May 11, 2007). First, the proponent must

produce a "statement or affidavit from someone with knowledge of the website." *Id.*
This affiant must have personal knowledge that the website "accurately reflects the
information the company supposedly hosting the website intended to display." *Id.*
Second, the proponent must call a witness who can testify that the printout
accurately reflects the content of the website on the computer at which the printout
was made. *Id.*

Exhibit 27 is a set of engineering plans. Although a party typically
authenticates exhibits through witness testimony, some exhibits may be self-
authenticating. Fed. R. Evid. 902. For example, a "document that bears: (A) a seal
purporting to be that of … any state, district … political subdivision … or a
department, agency, or officer … and (B) a signature purporting to be an execution
or attestation" is self-authenticating. Fed. R. Evid. 902(1). This rule does not require
the proponent to authenticate either the seal or the signature because "forgery is a
crime and the detection is fairly easy and certain." Barry Russell, *Bankruptcy
Evidence Manual* § 902:2 at 1270–71 (2021-2022 ed.).

Because Jeremy objects to Cale's authentication of exhibits 20 and 27–30, the
court turns to whether Cale properly authenticated those exhibits.

### a.      Cale properly authenticated exhibits 27 and 30

Cale properly authenticated exhibits 27 and 30. Exhibit 27 purports to be city
stamped engineering plans for an investment property Cale purchased on Scarritt
Avenue in Kansas City, Missouri. Cale testified at the trial that exhibit 27 is a public
record that contains the following language: "Reviewed for code compliance. City

Planning and Development, Development Services, City of Kansas City, Missouri."[3] Each page of exhibit 27 includes a stamped seal that purports to show that it comes from a Kansas City, Missouri, department or agency. The seal is also accompanied by Greg Franzen's signature, who is purportedly a building official with City Planning and Development in the Development Services department. Although Cale did not provide any evidence to authenticate the City's seal or Greg Franzen's position and signature, the rule does not require Cale to do so. It is sufficient that the seal purports to be that of a government body and the signature that of a public officer's attestation. Accordingly, exhibit 27 is self-authenticating and Cale does not need to provide any extrinsic evidence to authenticate the exhibit. The court will address Jeremy's hearsay objection to Exhibit 27 below.

Exhibit 30 purports to be a collection of photographs of the Scarritt property. Cale testified at trial that he took the photographs in exhibit 30 and that the images depicted in the photographs are of Jeremy's work at the Scarritt property. During Cale's questioning of Jeremy about photographs 1, 5, 9, and 12 of exhibit 30, Jeremy confirmed the images depicted Jeremy's work, further establishing that exhibit 30 is an accurate representation of the Scarritt property at the time Cale took the photographs. Because Cale has personal knowledge of the photographs in exhibit 30 and testified to their accuracy at the time he took them, he properly authenticated them. The court, therefore, overrules Jeremy's objection to exhibit 30.

---

[3] Tr. of Trial Hr'g (May 3 Trial Tr.) 32:17–25; 33:1–8, ECF No. 38.

### b.    Cale did not properly authenticate exhibits 20, 28, or 29

Cale did not properly authenticate exhibit 20.  Exhibit 20 purports to be a printout of Guitton and Swadley Service's ("G&S") HomeAdvisor webpage.  Cale did not provide an affidavit by anyone from HomeAdvisor or anyone who has knowledge of HomeAdvisor's website.  Cale could not testify that the webpage contained accurate information because he does not work for HomeAdvisor or have expertise in this field.  He, therefore, lacks personal knowledge of the website.  Cale also did not ask Jeremy if he created the webpage and Cale did not provide any evidence to establish that Jeremy had personal knowledge of the website.  In addition, exhibit 20 does not contain the website's URL or a timestamp that shows when Cale printed the webpage, further calling into question whether the exhibit accurately reflects the content of the website on the computer at which the printout was made.  Because Cale did not produce an affidavit from a person with knowledge of exhibit 20, HomeAdvisor's website, and because Cale did not establish that Jeremy had personal knowledge of the webpage, Cale failed to produce sufficient evidence to support a finding that exhibit 20 is what he says it is.  The court sustains Jeremy's objection to exhibit 20.

Cale did not properly authenticate exhibit 28.  Exhibit 28 purports to be a collection of photographs of the Scarritt property.  Cale testified at trial that the engineer he hired to inspect the property took the photographs.  Although Cale did not take the photographs, he testified that the court could "cross-reference them" with the photographs he took in exhibit 30.  During Cale's questioning of Jeremy about

photographs 5, 7, 17, 21, 23, 25, 27, 38, 40, 41, and 44 of exhibit 28, Jeremy testified that he recognized some of the images in the photographs, however, he also testified that he did not know who took them.  Although Cale testified to what the photographs depicted, Cale did not call the engineer to testify.  Because Cale did not call the engineer to testify, and neither Cale nor Jeremy attested to when the photographs were taken, Cale did not properly authenticate exhibit 28.  The court sustains Jeremy's objection to exhibit 28.

Cale also did not properly authenticate exhibit 29.  Exhibit 29 purports to be a printout of Jeremy's LinkedIn profile.  Exhibit 29 suffers from the same defects as exhibit 20.  Cale did not produce an affidavit of someone from LinkedIn or someone with knowledge of LinkedIn's website.  The exhibit does not include a URL or a timestamp, and although Jeremy testified that Cale "started stalking me and looking at my LinkedIn," Jeremy did not testify that exhibit 29 was an accurate printout of his LinkedIn profile.  For the same reasons the court sustained Jeremy's objection to exhibit 20, the court sustains Jeremy's objection to exhibit 29.

Because the court determines that Cale did not properly authenticate exhibits 20, 28, and 29, the court need not determine whether these documents constitute hearsay or, if they do, whether they fall within an exception to the rule against hearsay.

The court now analyzes whether exhibits 6, 7, and 27 violate the rule against hearsay.

### 2. The Rule Against Hearsay

Even if a proponent properly authenticates an exhibit, the exhibit may still be inadmissible if it violates the rule against hearsay. Hearsay is an out of court statement proffered to prove the truth of the matter asserted. Fed. R. Evid. 801. Such a statement, however, is not hearsay if the statement is (1) a declarant witness's prior testimony or (2) made by an opposing party. Fed. R. Evid. 801(d)(1), (2). If a proponent seeks to admit hearsay evidence and another party objects, the court will not admit the evidence unless the proponent establishes that an exception to the hearsay rule applies. Fed. R. Evid. 803, 807.

Here, Jeremy objects to exhibits 6, 7, and 27, asserting they are hearsay without an exception. Cale responds that the exhibits qualify as exceptions to the rule against hearsay, asserting exhibits 6 and 7 qualify under the business records exception and exhibit 27 qualifies under the public records exception. The court will first analyze whether the exhibits constitute hearsay, and, if they do, the court will then analyze whether any exception to the rule against hearsay applies.

### a. Exhibits 6 and 7 are not hearsay

The court must determine whether Cale proffers exhibits 6 and 7 to prove the truth of the matters asserted in each document. Exhibit 6 is an email chain among Sara Swadley, Jeremy, and an Arrow Renovation employee regarding an unpaid invoice from Total Construction. Exhibit 7 is an email Sara sent to the same Arrow employee that includes attached unpaid invoices from G&S. Cale seeks to introduce exhibits 6 and 7 to prove two things. First, that Jeremy created G&S to avoid Cale's

garnishment.  Second, that Sara lied in her Rule 2004 examination when she said she did not have a role in Total Construction.  Cale, however, does not proffer the exhibits to prove the truth of any statements asserted in the documents.  Exhibits 6 and 7 do not include any statements that assert Jeremy's purpose for creating G&S.  And Cale introduces the exhibits to impeach Sara's 2004 examination, which is a purpose other than proving the truth of any matter asserted in the exhibits.  Accordingly, exhibits 6 and 7 are not hearsay.  Because Cale proffers exhibits 6 and 7 for non-hearsay purposes, the court overrules Jeremy's objections to those exhibits.

The court now analyzes whether exhibit 27 is hearsay and whether it falls within the public records exception.

### b.  Exhibit 27 is inadmissible hearsay

Cale offers exhibit 27, a set of engineering plans for the Scarritt property, to prove that Total Construction's work needed to be torn down and replaced.  Because Cale seeks to prove the truth of the matter asserted in the engineering plans, exhibit 27 is hearsay.  Jeremy objects to exhibit 27 and argues it contains inadmissible hearsay.  Cale asserts the exhibit falls within the public records exception to the rule against hearsay.

A document falls within the public records exception if it is authored by a public office or agency, and "(A) it sets out: (i) the office's activities; (ii) a matter observed while under a legal duty to report …; or (iii) in a civil case … factual findings from a legally authorized investigation; and (B) the opponent does not show … a lack of trustworthiness."  Fed. R. Evid. 803(8); *see In re Harmony Holdings, LLC*, 393 B.R.

409, 414–15 (Bankr. D. S.C. 2008) (determining that the public records exception does not apply merely because a document is filed with the bankruptcy court). The public records exception rests on the assumption that public officials will perform their duties properly and are unlikely to remember details independently of the record. *Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 613, 618 (8th Cir. 1983) (citing the advisory committee note).

Though exhibit 27 is self-authenticating under rule 902(1) as a sealed and signed domestic public document, Cale has not established that the exhibit satisfies the public records exception to the rule against hearsay. Exhibit 27 constitutes the purported expert opinions of the engineer Cale hired to evaluate the Scarritt property. Cale testified that the engineer he hired, not anyone from City Planning and Development, reviewed the property and created the plans. Consequently, exhibit 27 is not admissible under rule 803(8)(A)(i) because the engineering plans do not set out City Planning and Development's activities. Exhibit 27 is not admissible under rule 803(8)(A)(ii) because Cale has not established that the engineer had a legal duty to inspect the Scarritt property or report his findings following his inspection. Finally, exhibit 27 is not admissible under rule 803(8)(A)(iii) because Cale has not established that the engineering plans constitute a public agency's factual findings or that City Planning and Development adopted the engineering plans as their findings. Because Cale has not satisfied his burden to prove exhibit 27 qualifies under the public records exception to the hearsay rule, the court sustains Jeremy's objection to exhibit 27.

The court, therefore, sustains Jeremy's objections to exhibits 20–23, and 27–29, and overrules Jeremy's objection to exhibits 6, 7, and 30.  Exhibits 6, 7, and 30 are admitted, the other exhibits in question are not.

Having addressed the outstanding evidentiary issues, the court now discusses the factual background of the present dispute.

## BACKGROUND

Cale, a pro se plaintiff, spent much of the trial reading verbatim the factual allegations in his complaint and excerpts from Jeremy's 2004 examination.  The court warned Cale that quoting the complaint would not alone satisfy his burden to proffer admissible evidence.  But the court permitted Cale to read the excerpts in deference to Cale's chosen litigation strategy.  Lacking a clear presentation of evidence, the court carefully reviewed the record to reach the following findings of fact.  Additionally, the court takes judicial notice of the filings on the docket in this adversary proceeding and in the main bankruptcy case, *In re Guitton-Belon*, Case No. 21-40994.

The following describes the rise and ultimate deterioration of the business relationship between Cale and Jeremy.  Both parties bear some responsibility for that deterioration.

First, Cale's inexperience as a real estate investor caused significant, costly delays.  For example, due to his inexperience, Cale purchased the Scarritt property without an inspection.  As a result, both parties were unaware of numerous defects in the property when they negotiated the scope of work for the Scarritt property, and

when Jeremy began work that Cale eventually needed to replace—at significant unanticipated cost. Cale's inexperience also caused him to fail to obtain permits timely, which further delayed the project and increased costs.

Second, after Cale obtained a judgment against Jeremy's company for the money Cale lost on the Scarritt property and a second judgment holding Jeremy individually liable for the company's debt, Jeremy spent ten months frustrating Cale's collection efforts until he ultimately filed for chapter 7 relief. With this brief overview in mind, the court will now discuss in detail the relevant facts to this dispute.

The parties' dispute dates back over two years. It began when Cale hired Jeremy's company to renovate an investment property in January 2020. Jeremy is an immigrant from Lima, Peru who created his construction company, Total Construction, LLC, in January 2018.[4] Cale is a pharmacist who met Jeremy shortly before Cale purchased his first investment property.[5]

Jeremy had experience in marketing and sales but did not have prior construction experience when he created Total Construction.[6] Jeremy's business model was to hire independent contractors who did the work for the clients Jeremy found.[7] Jeremy testified that most of his work came from referrals, but that he advertised Total Construction on different websites, including through personalized

---

[4] Tr. of Continuation of Trial Hr'g (May 17 Trial Tr.) 4:14–21; 5:5–8; 6:4–8; 7:3–8, ECF No. 39.
[5] Tr. of Trial Hr'g (May 3 Trial Tr.) 137:9–10; 161:12–13, ECF No. 38.
[6] May 17 Trial Tr. 8:9; 88:4–12, ECF No. 39.
[7] *Id.* 8:12–21; 88:13–22.

pages on home renovation websites.[8]  It was through one of these personalized pages,

Thumbtack, that Jeremy met Cale.[9]

## The Scarritt Property

Cale purchased a one-hundred-year-old investment property on Scarritt

Avenue in Kansas City, Missouri, in early January 2020.[10]  The record reflects that

the property had frozen and burst pipes and the electricity had been off for at least

one to two years before Cale purchased the property.[11]  Cale did not hire an inspector

to inspect the house prior to closing.[12]  This proved costly because some of the wood

in the property's roof, walls, and flooring was rotted and infested with ants and

termites.[13]  The rotted wood caused Cale to expend more money than he budgeted.[14]

Cale admitted that had he known of the property's defects, he would have offered less

money to purchase the property or not purchased it at all.[15]

Before closing on the property, Cale began reaching out to contractors for bids

to renovate the property.[16]  Specifically, Cale contacted Jeremy through Total

Construction's Thumbtack page in December 2019 and asked Jeremy to look at the

property before providing a bid.[17]  Jeremy offered to walk Cale through a different

---

[8] May 3 Trial Tr. 236:8–10, ECF No 38.
[9] *Id.* 46:6–8; 140:2–9.
[10] *Id.* 128:6–14; 136:25; 137:1–11.
[11] *Id.* 180:23–25; 200:6–13.
[12] *Id.* 199:5–18.
[13] Def.'s Exs. for Trial, Ex. D, 30, 41, 100–101, ECF No. 23; May 3 Trial Tr. 186:25; 187:1–3, ECF No. 38.
[14] Def.'s Exs. for Trial, Ex. D, 41, ECF No. 23; May 3 Trial Tr. 187:1–3 ECF No. 38.
[15] Def.'s Exs. for Trial, Ex. D, 56 ECF No. 23.
[16] *Id.* 12.
[17] May 3 Trial Tr. 46:6–8; 140:2–9, ECF No. 38; Def.'s Exs. for Trial, Ex. D, 12, ECF No. 23.

property Total Construction renovated so Cale could assess Total Construction's work.[18]

After receiving Total Construction's bid and reviewing its work, Cale accepted the bid on January 7, 2020, and the parties began negotiating the terms of a construction contract.[19]   Cale sent Jeremy a detailed email specifying the scope of work for the project, including additions, repairs, replacements, and demolition, and the specifications for the material Total Construction would use.   Jeremy incorporated Cale's scope of work into the parties' contract.[20]  The contract terms are as follows: Total Construction was to employ three laborers for 40 hours per week, who would perform pursuant to the scope of work.[21]   Total Construction would also provide a supervisor (Jeremy) who would oversee the laborer's work, obtain materials, and coordinate with Cale.[22]  Total Construction would complete the scope of work in a "substantial workmanlike manner."[23]   In return, Cale would pay Total Construction $5,000 per week—$2,000 at the start of the week and the remaining $3,000 at the end of the week.[24]

Before Total Construction started work on the Scarritt property, Cale had already begun to look for more investment properties.[25]   In fact, in reference to a

---

[18] Def.'s Exs. for Trial, Ex. D, 21, ECF No. 23.
[19] *Id.* 14–18.
[20] Def.'s Exs. for Trial, Ex. A, 1, ECF No. 23; May 17 Trial Tr. 56:13–25; 57:1–20, ECF No. 39.
[21] Def.'s Exs. for Trial, Ex. A, 1, ECF No. 23.
[22] *Id.* 1.
[23] *Id.* 2.
[24] *Id.* 1.
[25] Def.'s Exs. for Trial, Ex. D, 21, ECF No. 23.

"larger project," Cale asked Jeremy in January 2020 if Total Construction could add a room and a bathroom, to which Jeremy responded that he could do the work if Cale would apply for and obtain the necessary building permits.[26] Cale indicated that once he secured financing, he would hire Total Construction to renovate this second investment property.[27]

Total Construction started working on the Scarritt property the morning of January 16, 2020.[28] At about this time a city inspector informed Cale that he would not approve an electrical permit until Cale obtained permits for his plumbing and the kitchen remodel.[29] Jeremy told Cale that Jeremy could not apply for those permits because he was not a general contractor, and that Cale should obtain the permits as the property owner.[30]

The inspector conducted a second inspection of the property on January 30.[31] This time, the inspector informed Cale that he would not approve the electrical permit until Cale obtained permits for sheetrock, plumbing, flooring, siding, and roofing.[32] When Cale relayed this information to Jeremy, Jeremy contradicted the inspector and stated that sheetrock, flooring, siding, or other work Cale asked Total Construction to complete at the property did not require permits.[33]

---

[26] Def.'s Exs. for Trial, Ex. D, 21, ECF No. 23.

[27] *Id.* 40–43.

[28] *Id.* 20.

[29] *Id.* 51–52.

[30] *Id.* 52–53.

[31] *Id.* 87.

[32] *Id.* 88–89.

[33] *Id.*

To move the remodeling process forward, Cale hired an engineer to prepare building plans and hired a general contractor to apply for the necessary building permits.[34]  The contractor, however, insisted that it would not apply for any permits unless it also did the work that required the permit.[35]  Based on the estimates from the contractor, Cale stated he would deduct from Total Construction's pay the amount Cale would pay the contractor to complete any work he hired Total Construction to do that required a permit.[36]  This caused Jeremy and Cale to disagree over the cost to finish the project.[37]

It appears that from mid-February to mid-March, Total Construction could do little work on the property while Cale waited for the city to approve the permits and engineering plans.[38]

Even with the delays and permit issues, it appears that Cale had no intention of hiring a different contractor to remodel the Scarritt property until Cale started running into liquidity issues.[39]  By early March, Cale's lenders told Cale they wanted their money back because of the lack of progress on the property.[40]  Cale requested a $3,900 refund from Jeremy so Cale could pay back the lenders.[41]  Although the parties disputed the correct refund amount, Jeremy gave Cale a check for $3,900 on March

---

[34] May 3 Trial Tr. 198:19–22, ECF No. 38; Def.'s Exs. for Trial, Ex. D, 94–95, 103, 121, 125, ECF No. 23.

[35] May 3 Trial Tr. 209:6–17, ECF No. 38; Def.'s Exs. for Trial, Ex. D, 121, ECF No. 23.

[36] Def.'s Exs. for Trial, Ex. D, 121–122, ECF No. 23.

[37] *Id.* 112–116.

[38] *Id.* 122–135.

[39] *Id.* 134.

[40] *Id.* 133.

[41] *Id.* 133–134.

17.[42]  The parties disagree whether the refund settled the dispute and terminated their business relationship.  Jeremy testified that he believed the refund settled their dispute and ended their business relationship.  Cale testified that the refund only partially settled the dispute and that he believed Total Construction would also sufficiently fix its work so that the Scarritt property passed inspection.[43]

The city ultimately approved the engineering plans in early April, three months after Cale hired Total Construction.[44]  On April 8, Jeremy, Cale, and the engineer met at the Scarritt property to review the plans.[45]  Cale asserts that at the April 8 meeting, the engineer stated that all the work in the kitchen needed to be torn down and replaced.[46]  Jeremy asserts that the engineer stated Jeremy only needed to reinforce and jack up (i.e., raise) the work Total Construction had already done.[47]  Total Construction did not perform any further work on the property following the walkthrough with the engineer.[48]

<u>Cale's Default Judgment, Garnishment, and Jeremy's Transfers</u>

Shortly after the walkthrough of the property, Cale sued Total Construction in state court in May 2020.[49]  Jeremy did not receive notice of the suit because he moved multiple times without updating Total Construction's business address with the

---

[42] May 3 Trial Tr. 190:8–10, ECF No. 38; Def.'s Exs. for Trial, Ex. D,142–143, ECF No. 23.
[43] May 3 Trial Tr. 215:1–13, ECF No. 38; May 17 Trial Tr. 71:9–25, ECF No. 39.
[44] May 3 Trial Tr. 244:16–20.
[45] *Id.* 243:6–23; 246:8–21; Def.'s Exs. for Trial, Ex. D, 145–46, ECF No. 23.
[46] May 3 Trial Tr. 245:1–25, ECF No. 38.
[47] *Id.* 243:24–25; 244:1–25; 245:1–25; 246:14–18; 259:10–13; Def.'s Exs. for Trial, Ex. D, at 26, ECF No. 23.
[48] May 3 Trial Tr. 244:5–6, ECF No. 38.
[49] Def.'s Exs. for Trial, Ex. F, 1, ECF No. 23.

Kansas Secretary of State.[50]   Cale obtained a default judgment against Total Construction in September 2020.[51]

In an effort to collect on his judgment, Cale garnished Total Construction's bank account.[52]   That same day, Jeremy sent an invoice for $2,304.50 to Arrow Renovation for work on the Amber Smith project.[53]   Also on that same day, Jeremy created G&S with Sara Swadley.[54]   Jeremy owned eighty percent of the new entity and Sara owned twenty percent.[55]   After creating G&S, Jeremy resent the invoice of the Amber Smith project, but this time in the name of G&S.[56]   Jeremy admits that he instructed Arrow Renovation to pay G&S instead of Total Construction to avoid Cale's garnishment so G&S could pay one of Total Construction's subcontractors.[57]

In March 2021, Cale filed a motion in state court to pierce Total Construction's corporate veil and hold Jeremy personally liable for the judgment.[58]   Jeremy was represented by counsel and had knowledge of Cale's veil piercing motion.[59]   In June 2021, Cale obtained a default judgment piercing Total Construction's corporate veil, making Jeremy liable for Cale's default judgment.[60]

---

[50] May 17 Trial Tr. 15:21–23; 23: 22–15; 23:1–9, ECF No. 39.

[51] Compl. ¶10, ECF No. 1; Def.'s Answer to Compl. ¶1, ECF No. 13.  At the May 3 trial Cale asserted that this court should apply collateral estoppel or *res judicata* to his default judgment.  May 3 Trial Tr. 37:14–17; 38:11–25; 39:1–16.  The court declined to apply either to the elements at issue because Cale did not provide the court with the default judgment. May 3 Trial Tr. 39:10–16.

[52] May 17 Trial Tr.  42:13–17, ECF No. 39.

[53] Pl.'s Exs. for Trial, Ex. 4, ECF No. 24.

[54] Compl. ¶25, ECF No. 1; Def.'s Answer to Compl. ¶1, ECF No. 13.

[55] May 17 Trial Tr. 25:8–16' ECF No. 39.

[56] *Id.* 34:10–19; Pl.'s Exs. for Trial, Ex. 3, ECF No. 24.

[57] May 17 Trial Tr. 34:20–25; 35:1–8, ECF No. 39.

[58] Compl. ¶14, ECF No. 1; Def.'s Answer to Compl. ¶1, ECF No. 13.

[59] Compl. ¶14, 15, ECF No. 1; Def.'s Answer to Compl. ¶1, ECF No. 13.

[60] May 3 Trial Tr. 8:8–12; 37:14–25; 38:1–7, ECF No. 38.

Jeremy admits to transferring assets to Sara between February 2021 and July 2021. First, Jeremy transferred his eighty percent ownership interest in G&S to Sara in February 2021 for no consideration.[61] Then, Jeremy transferred approximately $2,900 to Sara in May 2021.[62] Later that month and after advice from Jeremy's bankruptcy counsel, Jeremy instructed Sara to reverse the transfer and Sara transferred approximately $2,400 back to Jeremy.[63] Finally, immediately after purchasing a 1998 Ford F-150 in May 2021, Jeremy transferred title to Sara.[64] Jeremy testified that he transferred title to minimize his insurance premiums.[65]

<u>Jeremy's Bankruptcy and Cale's Adversary Proceeding</u>

Jeremy filed his chapter 7 bankruptcy petition in August 2021.[66] Jeremy scheduled a $50,000 claim for Cale Investments LLC relating to the judgment against Total Construction on his Schedule E/F.[67] Cale testified that the remaining balance of the default judgment is approximately $47,000.[68] The trustee filed a report of no distribution seven months later, in February 2022.[69] Cale's former counsel took Jeremy and Sara's Rule 2004 examinations in November 2021.[70]

---

[61] Compl. ¶42, ECF No. 1; Def.'s Answer to Compl. ¶1, ECF No. 13.

[62] May 3 Trial Tr. 130:7–13, ECF No. 38.

[63] *Id.* 130:7–13; *In re Guitton-Belon*, 21-40994 (Bankr. W.D. Mo. Aug. 9. 2021), Amended Statement of Financial Affairs 6, ECF No. 37.

[64] Compl. ¶64, ECF No. 1; Def.'s Answer to Compl. ¶1, ECF No. 13; *In re Guitton-Belon*, 21-40994 (Bankr. W.D. Mo. Aug. 9. 2021), Amended Statement of Financial Affairs 6, ECF No. 37.

[65] *Id.*

[66] *In re Guitton-Belon*, 21-40994 (Bankr. W.D. Mo. Aug. 9. 2021), ECF No. 1.

[67] *Id.*

[68] May 3 Trial Tr. 40:8–11, ECF No. 38.

[69] *In re Guitton-Belon*, 21-40994 (Bankr. W.D. Mo. Aug. 9. 2021) Trustee's Report of No Distribution, ECF No. 46.

[70] Cale's counsel withdrew as attorney for Cale on January 25, 2022. *In re Guitton-Belon*, 21-40994 (Bankr. W.D. Mo. Aug. 9. 2021), Order Granting Mot. to Withdraw, ECF No. 43.

Cale commenced this adversary proceeding in January 2022.[71] Cale asserts one count under 11 U.S.C. § 523(a)(2)(A), asking the court to except Cale's default judgment from Jeremy's chapter 7 discharge.[72] Alternatively, Cale asserts four counts under 11 U.S.C. § 727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(4)(B), asking the court to deny Jeremy's chapter 7 discharge entirely.[73]

Having explained the relevant background information, the court turns to the merits of the present dispute.

## ANALYSIS

The purpose of the Bankruptcy Code is to provide the "honest but unfortunate debtor" a fresh start. *See Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (stating that the Bankruptcy Act provided a debtor "a new opportunity in life … unhampered by the pressure and discouragement of pre-existing debt"). Sections 523 and 727, however, provide a counterweight to the "fresh start" when Congress concluded "creditors' interests in recovering full payment of [certain] debts" outweigh a debtor's interest in receiving a fresh start. *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

Cale brings his complaint under §§ 523(a)(2)(A) and 727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(4)(B). The court will discuss Cale's causes of action in the order Cale asserts them, starting with § 523(a)(2)(A).

---

[71] Compl., ECF No. 1.

[72] Compl. ¶¶ 115–117, ECF No. 1. At trial, Cale abandoned his second count under 11 U.S.C. § 523(a)(2)(C)(II). May 3 Trial Tr. at 4:10–15; 5:1–4.

[73] Compl. ¶¶ 121–142, ECF No. 1.

### A. 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge any debt "for money… to the extent [the debt is] obtained by — false pretenses, a false representation or actual fraud…." 11 U.S.C. § 523(a)(2)(A).   Section 523(a)(2)(A) is "a tailored remedy for behavior connected to specific debts." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 364 (2016). The court should construe § 523(a) narrowly in favor of the debtor.   *Werner v. Hofmann*, 5 F.3d 1170, 1172 (8th Cir. 1993).

The purpose of § 523(a)(2) is twofold, to prevent a debtor from retaining property the debtor fraudulently obtained and to ensure that bankruptcy relief is not available to dishonest debtors.   4 Collier on Bankruptcy ¶ 523.08[1][a] (Richard Levin & Henry J. Sommer eds., 16th ed. 2018).

To succeed under § 523(a)(2)(A) for false representation, a plaintiff must establish: "that a debtor (1) made a representation; (2) with knowledge of its falsity; (3) deliberately for the purpose of deceiving the creditor; (4) who justifiably relied on the representation; and which (5) proximately caused the creditor damage." *Lariat Cos., Inc. v. Wigley (In re Wigley)*, 620 B.R. 87, 91 (B.A.P. 8th Cir. 2020) (citation omitted), *aff'd*, 15 F.4th 1208 (8th Cir. 2021).

The court will analyze each of the five elements.

### 1.    Cale failed to establish that Jeremy made a false representation

The court first must determine whether Jeremy made a false representation. *Lariat*, 620 B.R. at 91.   A debtor makes a false representation by making a false oral or written assertion, engaging in conduct "that amounts to an assertion not in

accordance with the truth," or remaining silent regarding a material fact. *Merchants National Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999).

Here, Cale asserts Jeremy made three false representations.  First, Cale asserts Jeremy falsely claimed on Total Construction's Thumbtack page that it offered a warranty.  Second, Cale asserts that Jeremy lied when he said Cale would not need to pull a permit for any work where Jeremy was just fixing an existing structure, rather than constructing a new structure.  Third, Cale asserts Jeremy falsely claimed that Total Construction had the necessary expertise to complete the scope of work at the Scarritt property.

Cale has not established that Jeremy's representation on Total Construction's Thumbtack page that it offers a warranty is false.  Cale points to the bottom righthand corner of the Thumbtack page where Jeremy wrote "[p]rices are fair, we offer warranty for our job and always try to exceed expectations."  Jeremy, however, testified that this statement is true; he testified that Total Construction selectively offered warranties, but that it never offered Cale a warranty, and that Cale did not request a warranty.  Jeremy's testimony that Total Construction did not offer Cale a warranty is consistent with his business practice.  For example, Jeremy testified that while Total Construction sometimes offered a warranty to Arrow Renovation, the offer depended on the condition and age of the property.  The Scarritt property is over one hundred years old and was in disrepair.

If Total Construction only offers warranties for properties in good condition, as the evidence suggests, then it would be consistent with Total Construction's business practice to not offer a warranty to Cale for the Scarritt property.  Regardless, Cale did not produce any contrary evidence to show that Total Construction did not offer warranties to some customers.  Consequently, Cale did not establish that Jeremy falsely claimed to offer a warranty on Total Construction's Thumbtack page.

Next, Cale did not establish that Jeremy repeatedly lied when he said that Cale would not need to pull a permit for any work where Jeremy was just fixing an existing structure, rather than constructing a new structure.  Jeremy maintained the truth of this statement through trial and the evidence in this case is consistent with the truth of that statement.  For example, at the outset of their relationship, Jeremy said Total Construction could not build a bathroom on Cale's other investment property—a project involving the construction of a new structure—unless Cale first pulled a permit.  And although Total Construction's work may have blurred the line between fixing and constructing because of the significant and unexpected change in the scope of the project over time, ultimately, Cale did not call a witness to establish whether work involving repairs, rather than construction, required a permit.  Accordingly, Cale has not established that Jeremy lied when he stated Cale would not need to pull a permit for any work where Jeremy was just fixing an existing structure.

Lastly, Cale did not establish that Jeremy falsely claimed that Total Construction had the necessary expertise to complete the scope of work at the Scarritt

property.  Jeremy has operated Total Construction since 2018.  While Jeremy did not have prior construction experience, he testified that Total Construction's business practice was to hire experienced independent contractors to perform the work and Jeremy managed the projects.  Prior to Cale hiring Jeremy, Jeremy invited Cale to another property so Cale could see Total Construction's work.  Cale appears to have been satisfied with Total Construction's work because he hired the company following the walk through.  And even if Cale can show that Total Construction failed to adequately perform under the contract, that would not establish that it lacked the expertise to perform the scope of work because the work the Scarritt property ultimately required significantly exceeded the scope of work Cale requested and Jeremy represented he could perform in the parties' contract.  Cale, therefore, has not established that Jeremy falsely claimed that Total Construction had the necessary expertise to complete the scope of work.

### 2.   Cale failed to establish that Jeremy knowingly made false representations

The court next must determine whether Jeremy knowingly made a false representation.  *Lariat*, 620 B.R. at 91.  The court may infer a debtor's knowledge of the falsity of his representation from the totality of the circumstances, including the debtor's experience and knowledge of the facts.  *In re Moen*, 238 B.R. at 791 (quoting *(FTC v. Duggan (In re Duggan)*, 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994)).

Here even if Jeremy's representation that Total Construction offered a warranty was false, Cale failed to provide any evidence that would establish, or even allow the court to infer, that Jeremy knew the representation was false when he made

it.   At most, the record appears to show that Jeremy did not understand the significance of the offer of warranty given his struggles with English at the time he created the Thumbtack page.  This is supported by Jeremy's testimony that he copied and pasted the information on the page from another source because "[his] English at the time was really bad so [he] could not make a good description of the business." Accordingly, Cale has not established that Jeremy knew his representation was false at the time Jeremy made the representation.

Next, Cale did not establish that Jeremy knew his claim that Cale did not need a permit to fix an existing structure was false.  The record shows that Jeremy told Cale that he could not do certain projects, such as building a bathroom, unless Cale obtained a permit.  This is consistent with Jeremy's understanding that fixing an existing structure, as opposed to building a new structure, did not require a permit. Because Cale has not provided any contrary evidence to show Jeremy had a different understanding of what work required a permit, the court determines that Cale has not established that Jeremy knew this representation was false.

Lastly, Cale did not establish that Jeremy knew it was false that Total Construction had the necessary expertise to complete the scope of work at the Scarritt property.  The record appears to show that Jeremy believed Total Construction's contractors had the necessary expertise to perform the scope of work listed in the contract. Jeremy testified that he would hire a contractor if he believed the contractor did good work and that he would fire the contractor if it turned out the contractor did not do good work.  Given that this is the only evidence the court has regarding

Jeremy's mental state at the time he made the representation, the court determines that Cale has not established that Jeremy knew his representation was false.

### 3. Cale failed to establish that Jeremy made false representations deliberately and with the purpose of deceiving Cale

The court next must determine whether Jeremy deliberately made false representations to deceive Cale. *Lariat*, 620 B.R. at 91. This element does not require the court to find malevolence or ill will. The court need only find the debtor intended to induce the creditor to rely and act on the debtor's misrepresentation. *In re Moen*, 238 B.R. at 791 (quoting *Moodie-Yannotti v. Swan (In re Swan)*, 156 B.R. 618, 623 n.6 (Bankr. D. Minn. 1993)). "Because direct proof of intent (*i.e.*, the debtor's state of mind) is nearly impossible to obtain," the court may infer intent from evidence of the surrounding circumstances. *Id.* (quoting *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1257 (8th Cir. 1987), *abrogated on other grounds* by *Grogan v. Garner*, 498 U.S. 279 (1991)).

Here, Cale has not established that Jeremy deliberately made false representations with the intent to deceive Cale. Even if Jeremy had made the alleged false representations, Cale must still prove that Jeremy deliberately sought to induce Cale to rely and act upon the false representations. Neither party has provided evidence to prove Jeremy's intent when he made the representations or from which the court can infer intent. And because Cale carries the burden of proof, the court determines Cale has not established this element.

**4.      Cale did not justifiably rely on Jeremy's purported false representations**

The court next must determine whether Cale justifiably relied on Jeremy's purported false representations. *Lariat*, 620 B.R. at 91. A creditor justifiably relies on a representation if, based on the creditor's unique attributes, he or she could not have ascertained the falsity of a representation by use of his or her senses. *Field v. Mans*, 516 U.S. 59, 70–75 (1995). Though justifiable reliance does not require the creditor to "conform to the standard of the reasonable man," or to investigate the truth of the debtor's representations, a creditor is not justified in relying on a representation if a "cursory glance" would have alerted the creditor to the falsity of the representation or to facts that should have prompted further investigation. *Id.* at 71–72.

Here, Cale failed to establish that he justifiably relied on Jeremy's representation that Total Construction offered a warranty. Cale did not testify that he hired Total Construction because of the offer of warranty on its Thumbtack page. Even if Cale had relied on Total Construction's warranty, his reliance was not justified because a cursory glance of the contract reveals that the document does not include a warranty. This is telling because Cale took an active role in drafting the contract and consequently should have known that there was no warranty in the contract. Accordingly, Cale cannot establish that he justifiably relied on Jeremy's purported false representation.

Next, Cale has not established that he justifiably relied on Jeremy's representation that the work on the Scarritt property would not require a permit.

The evidence establishes that each time Jeremy made that representation it was based on the original agreed-upon scope of the work the Scarritt property would require. Cale caused that inaccurate understanding by declining to hire an inspector to inspect the property despite the property's age and dilapidated condition, then perpetuated it by drafting a poorly tailored scope of work. Because Cale took a risk by not inspecting the property before buying it and drafting his scope of work, any reliance on Jeremy's representation that the work would not require permits was not justifiable under the circumstances of this case.

Cale also has not established that he justifiably relied on Jeremy's representation that Total Construction had the necessary expertise to fix existing structures at the Scarritt property. Even if the representation was false, Cale still cannot show his reliance was justified. The evidence establishes Cale hired Total Construction rather than a licensed contractor because he prioritized cost-saving and speed of work over expertise. Cale knew that Jeremy did not have his general contractor's license and that Jeremy could not obtain permits for any structural work. Because Cale knew Total Construction was an unlicensed contractor, this fact should have alerted Cale to investigate whether Total Construction had the necessary expertise to remodel a one-hundred-year-old dilapidated property. Cale has not provided any evidence that he investigated Total Construction's level of expertise. Accordingly, Cale did not justifiably rely on any representation by Jeremy that Total Construction had the necessary expertise.

5.    **Jeremy's purported false representations did not proximately cause Cale's damages**

Lastly, the court must determine whether Jeremy's purported false representations proximately caused Cale's damages. *Lariat*, 620 B.R. at 91. A misrepresentation proximately causes a creditor's damage if the "creditor would not have suffered the loss at issue but for the debtor's actions." *Wernes v. Kroesen (In re Kroesen)*, No. 18-42624, 2020 WL 2121273, at *18 (Bankr. W.D. Mo. May 1, 2020) (citing *Rezac v. Maier (In re Maier)*, 38 B.R. 231, 233 (Bankr. D. Minn. 1984)). This element requires "creditors to prove that their loss was a foreseeable result of the misrepresentation." *Kroesen*, 2020 WL 2121273, at *18 (citing *Stifel, Nicolaus & Company, Inc. v. Smithson (In re Smithson)*, 372 B.R. 913, 922 (Bankr. E.D. Mo. 2007)).

Even if Jeremy made false representations that Cale relied on, Cale did not establish that his damages resulted from those representations. The evidence establishes that Cale's damages resulted from his lack of foresight and his decision to purchase a one-hundred-year-old house without inspection despite the Scarritt property's dilapidated condition. Because Cale purchased the property without understanding its condition or the home remodeling industry, both parties substantially underestimated the work required to remodel the property. Consequently, Cale's damages are attributable to his own actions.

Cale, moreover, has not sufficiently established Total Construction's work proximately caused his damages. Cale tries to establish proximate cause with the engineering report, however, that report is inadmissible hearsay. But even if the

report was admissible evidence, without an expert witness the court could not determine whether it was Total Construction's work or the original, one-hundred-year-old construction that the engineer allegedly stated must be removed and replaced. Based on the evidentiary record, the court cannot determine whether Cale's losses resulted from his own conduct or Jeremy's alleged false representations. Accordingly, Cale has not established that Jeremy's purported false representations caused Cale's damages.

Because Cale failed to establish by a preponderance of the evidence the elements of § 523(a)(2)(A), Cale did not satisfy his burden to except his judgment from Jeremy's discharge. The court now analyzes whether to deny Jeremy's discharge entirely.

### B. 11 U.S.C. § 727(a)(2)(A)

To succeed under § 727(a)(2)(A), a plaintiff must establish (1) the debtor transferred, removed, destroyed, or concealed property of the debtor (2) within one year of the petition date (3) with the intent to hinder, delay, or defraud a creditor. 11 U.S.C. § 727(a)(2)(A). Unlike § 523(a)(2)(A), which is a "tailored remedy for behavior connected to specific debts," § 727(a)(2)(A) is a "blunt remedy for actions that hinder the entire bankruptcy process." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 364 (2016). Because "denial of a discharge is a harsh remedy," the court must construe § 727(a) strictly in favor of the debtor. *Snyder v. Dykes (In re Dykes)*, 954 F.3d 1157, 1162 (8th Cir. 2020). "[T]he reasons for denying a discharge … must be real and substantial, not merely technical and conjectural." *Equitable Bank v. Miller (In re*

*Miller)*, 39 F.3d 301, 304 (11th Cir. 1994) (quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987)).

### 1.    Cale established that Jeremy transferred property

A court may not deny a debtor a discharge unless the plaintiff establishes that the debtor transferred, removed, destroyed, or concealed the debtor's property. 11 U.S.C. § 727(a)(2)(A). The Bankruptcy Code defines transfer as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D).

Cale focuses on the following four transfers Jeremy made within one year of filing his bankruptcy petition: Jeremy transferred (1) Total Construction's invoice, worth $2,304.50, to G&S; (2) his ownership interest in G&S to Sara; (3) $2,900 to Sara, which she promptly reversed minus $500 to repay a prior loan she made to Jeremy when he purchased the 1998 Ford truck; and (4) title of his 1998 Ford truck to Sara while he maintained possession of the vehicle. In total, the value of the four transfers equals $7,104.50, a little more than fifteen percent of Cale's default judgment.

At the outset we note the invoice belonged to Total Construction and not Jeremy. Assuming the invoice was Jeremy's property, however, Jeremy admits he effectuated these transfers and the first element under § 727(a)(2)(A) is satisfied. The court will next analyze the second element, whether Jeremy made the transfers within one year of the petition date.

### 2.      Jeremy transferred property within one year of the petition date

The court cannot deny a debtor's discharge unless the plaintiff establishes that the debtor transferred his property within one year of the bankruptcy petition. 11 U.S.C. § 727(a)(2)(A).

Jeremy made the first transfer in October 2020, the second transfer in February 2021, the third transfer in May 2021, and the fourth transfer in June 2021. Jeremy filed his chapter 7 petition August 2021.  Jeremy, therefore, made the relevant transfers within one year of his petition date. This element is satisfied.

### 3.      Jeremy did not act with intent to hinder, delay, or defraud Cale

Although § 727(a)(2) uses the phrase hinder, delay, or defraud, courts generally interpret the phrase as establishing a single test: whether the debtor had the requisite fraudulent intent.  *See Panuska v. Johnson (In re Johnson)*, 880 F.2d 78, 80 n.1 (8th Cir. 1989) (declining to separately analyze the terms hinder, delay, or defraud).  The court may look to the badges of fraud to infer fraudulent intent in a § 727(a)(2) action.  *See Sears v. Sears*, 863 F.3d 980, 985 (8th Cir. 2017) ("the so-called 'badges of fraud' support the bankruptcy court's inference.").

Bankruptcy courts have identified the following "badges of fraud" to determine whether a debtor conveyed property with fraudulent intent:

> (1) a conveyance to a spouse or near relative; (2) inadequacy of consideration; (3) transactions different from the usual method of transacting business; (4) transfers in anticipation of suit or execution; (5) retention of possession by the debtor; (6) the transfer of all or nearly all of the debtor's property; (7) insolvency caused by the transfer; and (8) failure to produce rebutting evidence when circumstances surrounding the transfer are suspicious.

*Fink v. Wright (In re Wright)*, 611 B.R. 319, 324 (Bankr. W.D. Mo. 2019).  Missouri law enumerates eleven additional factors that supplement the judicial badges of fraud:

> (1) The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was disclosed or concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Mo. Rev. Stat. § 428.024.2.  "The presence of several badges of fraud raises the presumption that a transfer was fraudulent." *In re Wight*, 611 B.R. at 325.

As to the inadequacy of consideration and lack of equivalent value, the court presumes fraudulent intent where the debtor gratuitously transfers valuable property. *City Nat'l Bank v. Bateman (In re Bateman)*, 646 F.2d 1220, 1222 (8th Cir. 1981) (under predecessor statute to § 727(a)(2)).  After a plaintiff establishes the debtor gratuitously transferred property, the burden then shifts to the debtor to prove he did not have the requisite fraudulent intent.  *Abbott Bank—Hemingford v. Armstrong (In re Armstrong)*, 931 F.2d 1233, 1239 (8th Cir. 1991).  Importantly, the intent to prefer one creditor over another is not equivalent to the intent to hinder,

delay, or defraud the jilted creditor. *Equitable Bank v. Miller (In re Miller)*, 39 F. 301, 307 (11th Cir. 1994).

As to the first badge of fraud under Missouri law, an "insider" can be someone with whom the transferor has a close relationship. *See Sears v. Sears*, 863 F.3d 980, 985 (8th Cir. 2017) (determining that a business associate with a "close relationship" with the debtor was sufficient).

The court infers from Cale's complaint that he alleges five badges of fraud: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3); before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (4) the debtor transferred assets in anticipation of suit or execution; and (5) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred.

Cale has established that Jeremy transferred his assets to insiders. Jeremy admits that he transferred Total Construction's invoice to G&S, an entity in which Jeremy had an eighty-percent ownership interest. Jeremy also admits to transferring to Sara (his live-in girlfriend) his stake in G&S, $2,900, and title to the 1998 Ford. Because Jeremy had sole ownership of Total Construction, a majority interest in G&S, and because he lived with Sara, the court determines Jeremy had a close relationship with the recipients. They, therefore, are insiders for these purposes under *In re Wright* and *In re Sears*.

36

Although Cale established Jeremy transferred his assets to insiders, Jeremy sufficiently persuades the court that he lacked fraudulent intent when he transferred the Total Construction invoice and the 1998 Ford. As to Total Construction's invoice, Jeremy testified that he transferred the invoice to G&S so that G&S could pay one of Total Construction's subcontractors. If Arrow paid Total Construction instead of G&S, Cale would have garnished any funds Total Construction deposited into its bank account. Jeremy's preference of one creditor over another does not sufficiently establish fraudulent intent. As to the 1998 Ford, Jeremy testified that he transferred the truck to Sara because the two believed they could lower their insurance premiums if the truck was titled in Sara's name. Jeremy and Sara lived together and shared expenses at the time of the transfer, and Jeremy had little income in 2021. Thus, it is reasonable that the two would look for ways to decrease their monthly expenses. Because Jeremy sufficiently established good faith when he transferred the invoice and 1998 Ford to insiders, the court determines those transfers do not evidence fraudulent intent.

Cale has established that Jeremy retained possession of the 1998 Ford even after he transferred it to Sara. Jeremy admits that he transferred legal title of the truck to Sara but that he retains a possessory and an equitable interest in the truck since he continues to use it as his personal vehicle. Thus, this badge of fraud weighs in Cale's favor.

Cale established that Jeremy had been sued or threatened with suit before he transferred his and Total Construction's property. Jeremy learned of Cale's suit

against Total Construction on October 20, 2020, when Cale garnished Total Construction's bank account. Thus, the court determines Cale established this badge of fraud respecting Jeremy's transfer of Total Construction's invoice to G&S.

Jeremy made a conscious decision to not contest Cale's veil piercing motion in March 2021. Thus, Jeremy knew of Cale's suit against him individually when Jeremy transferred $2,900 and title to the 1998 Ford to Sara in May and July 2021. The court determines Cale established this badge of fraud respecting Jeremy's transfer of the $2,900 and 1998 Ford to Sara.

Cale, however, did not establish that Jeremy knew of Cale's suit prior to Jeremy transferring his ownership interest in G&S to Sara in February 2021. Because Cale did not produce any evidence to prove that Jeremy knew Cale would move to pierce Total Construction's corporate veil prior to March 2021, the court determines Cale failed to establish this badge of fraud respecting Jeremy's transfer of his ownership interest in G&S to Sara.

Cale established that Jeremy transferred Total Construction's invoice to G&S in anticipation of Cale's garnishment. Jeremy admits he instructed Arrow Renovation to satisfy the invoice by paying G&S rather than Total Construction even though Arrow Renovation owed the sum to Total Construction. But as the court previously discussed, Jeremy transferred the invoice to prefer one of Total Construction's other creditors over Cale. Because intent to prefer one creditor over another is not the equivalent to intent to hinder, delay, or defraud a creditor, the

court determines that Cale has not established this badge of fraud for the transferred invoice.

Cale also established that Jeremy transferred $2,900 in anticipation of Cale's garnishment. During Jeremy's 2004 examination, Jeremy admitted that he transferred the $2,900 to Sara to avoid Cale's garnishment. Thus, the court determines Cale established this badge of fraud.

Cale did not establish that Jeremy transferred title to the 1998 Ford in anticipation of Cale's garnishment. Unlike the $2,900 transfer, Jeremy does not admit to transferring the title to avoid Cale's garnishment and Cale did not produce any evidence at trial to allow the court to infer that Jeremy made the transfer with fraudulent intent. As the court previously discussed, Jeremy appears to have transferred the truck to Sara to minimize their shared household expenses. Because that is the only evidence either party has presented to the court, this reasonable justification persuades the court that Jeremy did not transfer the Ford in anticipation of Cale's garnishment.

Cale failed to establish that Jeremy did not receive reasonably equivalent value when Jeremy transferred the Arrow Renovation invoice from Total Construction to G&S. Jeremy testified that he transferred the invoice, however, so that G&S could satisfy a pre-existing debt Total Construction owed to a subcontractor. Because G&S simply served as a conduit for payment of one of Total Construction's other creditors, the court determines that Cale has not established the lack of reasonably equivalent value for the transfer of the invoice.

Cale failed to establish that Jeremy did not receive reasonably equivalent value when he transferred title of his 1998 Ford to Sara. Jeremy purchased the 1998 Ford for $1,800. As the court previously discussed, Jeremy testified that he transferred title to save money on insurance premiums with the truck titled in Sara's name and that the transfer did not deprive Jeremy of the use or possession of the vehicle. Because Jeremy and Sara lived together and shared expenses at the time of the transfer, the purported value Jeremy received from the transfer was the difference between the two insurance premiums. But it is Cale's burden, not Jeremy's, to prove that this value was not reasonably equivalent to the value Sara received from the transfer. Because Cale did not provide any evidence to establish the value, or lack thereof, of what Jeremy received from the transfer, this badge of fraud does not sufficiently establish fraudulent intent.

Cale failed to establish that Jeremy did not receive reasonably equivalent value when he gave Sara his eighty percent ownership in G&S. Jeremy transferred his ownership interest in G&S to Sara in February 2021. At the time of transfer, G&S had approximately $6,000 in outstanding accounts receivables. Jeremy, however, credibly testified that he considered those receivables worthless because Arrow Renovation refused to pay. The evidence, therefore, establishes that Jeremy's eighty percent interest lacked any meaningful value. Further, Jeremy testified that in exchange for Jeremy's interest in G&S, Sara agreed to use Jeremy as G&S's contractor. Cale did not offer any evidence to contradict G&S's value—he only opined that Jeremy should have tried harder to collect the outstanding receivables. Jeremy's

40

transfer of his interest in G&S was not a transfer of an asset with any meaningful value. The court determines that Jeremy did not have the requisite fraudulent intent for this transfer.

Cale established that Jeremy did not receive reasonably equivalent value when he gratuitously transferred $2,900 to Sara. Because gratuitous transfers raise a presumption of fraudulent intent, it is Jeremy's burden to prove he did not have the requisite fraudulent intent. Jeremy stated he transferred the money because he needed money to pay for his bankruptcy case. And even though Jeremy transferred the money in May 2021, he had Sara reverse the transfer within two weeks, which is three months prior to when he filed his petition. Because Jeremy transferred the money to retain funds to pay his bankruptcy counsel, which transfer he quickly reversed upon the advice of that bankruptcy counsel three months before his petition date, the court determines the presence of this badge of fraud does not sufficiently establish that Jeremy acted with the requisite fraudulent intent.

Further, denial of discharge is an extreme remedy, and the court must strictly construe § 727 in favor of the debtor. Cale failed to establish that Jeremy had the requisite fraudulent intent. And even if there is a presumption of fraudulent intent for the $2,900 transfer, the court determines Jeremy properly rebutted the presumption because the $2,900 transfer would merely be a technical reason to deny Jeremy's discharge given the totality of the circumstances surrounding the transfer. Specifically, Jeremy reversed the transfer within two weeks, he used the money to fund his bankruptcy case, and he did not conceal the transfer from the court or his

creditors. As such, the transfer does not rise to the level to warrant the court granting such an extreme remedy by denying Jeremy his discharge.

Because Cale failed to establish by a preponderance of the evidence the elements of § 727(a)(2)(A), Cale did not satisfy his burden to convince the court to deny Jeremy's discharge under that subsection.

### C. 11 U.S.C. § 727(a)(3)

Cale next asks the court to deny Jeremy's discharge, alleging that Jeremy failed to maintain and preserve adequate records. To succeed under § 727(a)(3), a plaintiff must establish: "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." *Snyder v. Dykes (In re Dykes)*, 954 F.3d 1157, 1163. (8th Cir. 2020) (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir. 1992)). "The test is 'whether there is available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.'" *Id.*

Cale has not satisfied his burden to prove that Jeremy failed to maintain and preserve adequate records. Cale alleges that Jeremy did not maintain adequate records because he deleted two Facebook accounts, a website, and a Thumbtack page to conceal his business transactions. Cale does not establish how Jeremy's failure to maintain these webpages makes it impossible to ascertain Jeremy's financial condition and business transactions or properly understand Jeremy's financial

condition.  Further, Jeremy provided his bank records as exhibit B and spent time during the trial discussing those records, giving the court and the parties a proper understanding of the debtor's financial condition.  Cale proffered no other evidence of the condition of Jeremy's financial records.  The court determines that Cale has not satisfied his burden to establish Jeremy's failure to maintain the Facebook accounts and webpages either (1) amounted to a failure to maintain and preserve records of Jeremy's financial condition or (2) made it impossible to ascertain Jeremy's financial condition and material business transactions.  Cale's count under § 727(a)(3) must fail.

### D. 11 U.S.C. § 727(a)(4)(A)

Section 727(a)(4)(A) of the Bankruptcy Code empowers courts to withhold discharge from debtors who "knowingly and fraudulently, in or in connection with a case—(A) made a false oath or account."  11 U.S.C. § 727(a)(4)(A).

To prevail under § 727(a)(4)(A), the plaintiff must prove the following elements by a preponderance of the evidence: "(1) the [d]ebtor made a statement under oath; (2) the statement was false; (3) the [d]ebtor knew the statement was false; (4) the [d]ebtor made the statement with fraudulent intent; and (5) the statement related materially to the [d]ebtor's bankruptcy case." *Home Serv. Oil Co. v. Cecil (In re Cecil)*, 542 B.R. 447, 451 (B.A.P. 8th Cir. 2015).

Cale asserted that Jeremy made false oaths by lying on his Statement of Financial Affairs and during his Rule 2004 examination.  Cale initially asserted Jeremy lied on his Statement of Financial Affairs because his reported income for

2020 was inconsistent with his reported income on his original 2020 tax returns. At trial, however, Cale conceded that Jeremy correctly listed his income for 2020 on his Amended Statement of Financial Affairs. The court agrees that the evidence reflects that Jeremy did not make a false oath because he amended his 2020 tax return to reflect the same amount he listed on his Statement of Financial Affairs.

Having determined that Jeremy did not make any false oath in his Statement of Financial Affairs, the court will focus on Cale's allegations that Jeremy lied during his Rule 2004 examination.

**1.     Whether Jeremy made a statement under oath**

To deny a debtor's discharge, the court must first determine the debtor made a statement under oath. Statements a debtor makes at a 2004 examination constitute statements under oath. *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987).

Cale asserts that Jeremy made multiple false statements during his 2004 examination. Based on Cale's statements at trial, and after reviewing the evidence, the court infers that Cale is alleging that Jeremy lied:

- when he stated a main reason he filed for bankruptcy was because of his car debt and car insurance payments;

- when he stated he did not work from April to August 2020;

- when he stated he did not use payment platforms other than Venmo;

- when he stated Sara did not have a role in Total Construction;

- about the reason why he started G&S; and

- about Total Construction not having a website and Facebook account.

Because statements during 2004 examinations are under oath, the court determines Cale has established that Jeremy made the relevant statements under oath.

### 2.    Whether the statements were false

The court must also determine whether the relevant statements were false. Falsity is a question of fact the bankruptcy court must determine by assessing the evidence presented at trial. *See Kaler v. Charles* (*In re Charles*), 474 B.R. 680, 684–85 (B.A.P. 8th Cir. 2012) (explaining lower court's determination of falsity).

Cale asserts that Jeremy made multiple false statements during his 2004 examination. For example, when asked why Jeremy filed for bankruptcy, Jeremy in one instance stated Cale's garnishment was the main reason Jeremy declared bankruptcy and in another stated he filed because he had no income and had car payments he could not make. These competing statements are not contradictory. A debtor can have multiple reasons for seeking bankruptcy relief and it is not a lie to focus on different reasons during different portions of a 2004 examination. Cale has not established that Jeremy lied regarding his reasons for seeking bankruptcy relief.

Cale also asserts Jeremy lied about not having websites, Facebook accounts, or payment platforms. Jeremy testified at trial that in 2018 while in Peru he hired someone to create a website and Facebook account for Total Construction. He testified that the person created a template website and Facebook page but that the person never finished them. Because the person never finished, Jeremy testified he

did not know they existed.  Jeremy now concedes that the website and Facebook account exist but asserts that he never used them.  Thus, Jeremy's claim that Total Construction did not have a website or Facebook account was a false statement.

Regarding the payment platforms, Jeremy initially stated in his 2004 examination that he had a Venmo account.  When asked about other specific payment platforms, Jeremy later admitted that he had previously used Cash and Paypal a few times but that he only used Venmo during the period in question.  The court determines that Jeremy did not make any false statements regarding payment platforms because he testified at the 2004 examination that he used multiple platforms.  Cale has not provided evidence to prove that those statements were false.

### 3.  Jeremy did not know his statements were false

The court must also determine whether the debtor knew his statements were false.  *In re Cecil*, 542 B.R. at 451.

Cale did not establish that Jeremy knew his statement from his 2004 examination that Total Construction did not have a website or a Facebook account was false.  Jeremy testified that he hired someone in Peru to create a website and Facebook account for Total Construction.  But because Jeremy believed that person never finished the project, Jeremy credibly testified that he did not know the website or Facebook account existed.  Even though Cale provided the website and account as evidence at trial, Jeremy identified their contents as templates and further testified that he did not create the templates.  Thus, the court determines that Jeremy did not

know his statement that Total Construction did not have a website or Facebook account was false.

Because Cale has not satisfied his burden to prove that Jeremy made false statements during the 2004 examination or knew his statements were false, the court need not determine whether Jeremy made false statements with fraudulent intent that related materially to his bankruptcy case. Therefore, Cale has not provided sufficient evidence to establish an action under § 727(a)(4)(A).

### E. 11 U.S.C. § 727(a)(4)(B)

Section 727(a)(4)(B) of the Bankruptcy Code empowers courts to withhold discharge from debtors who "knowingly and fraudulently, in or in connection with a case—(B) presented or used a false claim." 11 U.S.C. § 727(a)(4)(B). To prove the debtor presented or used a false claim, a plaintiff must prove "the debtor represented or used an inflated or fictitious claim," by, for example, scheduling non-existent or inflated debts, or filing a false proof of claim. *Dranichak v. Rosetti*, 493 B.R. 370, 378 (N.D.N.Y. 2013).

It appears that Cale intended to withdraw this cause of action at trial because he did not understand the difference between § 727(a)(4)(A) and (a)(4)(B). Cale conceded at trial that he probably could not establish this action.

The court likewise determines that Cale did not satisfy his burden to establish an action under § 727(a)(4)(B). Cale does not provide any evidence to show that Jeremy scheduled non-existent or inflated debts or that he filed a false proof of claim.

Case 22-04003-btf   Doc 40   Filed 12/01/22   Entered 12/01/22 14:36:43   Desc Main
Document      Page 48 of 48

Therefore, the court determines Cale has not met his burden to establish an action under § 727(a)(4)(B).

**F.  11 U.S.C. § 523(d)**

If a creditor requests a determination of the dischargeability of a consumer debt under § 523(a)(2) and the debt is discharged, § 523(d) entitles the debtor to its costs and reasonable attorney's fees if the court determines the creditor's position was not substantially justified.  11 U.S.C. § 523(d).

It appears from the record that Jeremy's counsel withdrew this counterclaim. The court nonetheless determines § 523(d) does not apply because Jeremy's debt is a business debt and not a consumer debt.

## CONCLUSION

For the reasons explained above, the court determines Cale failed to meet his burden of proof on all counts in his complaint.  Consequently, Jeremy may receive a discharge in this case including a discharge of Cale's default judgment.  The court will enter a separate judgment for Jeremy on each cause of action in Cale's complaint and judgment for Cale on Jeremy's counterclaim.


Dated: 12/1/2022                          /s/ Brian T. Fenimore
                                          United States Bankruptcy Judge